**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: PLANT INSULATION CO.,
*Debtor*,

FIREMAN'S FUND INSURANCE
COMPANY; UNITED STATES FIRE
INSURANCE COMPANY,
*Plaintiffs*,

And

ONEBEACON INSURANCE COMPANY;
AMERICAN HOME ASSURANCE
COMPANY; GRANITE STATE
INSURANCE COMPANY; INSURANCE
COMPANY OF THE STATE OF
PENNSYLVANIA; INSURANCE
COMPANY OF THE WEST; SAFETY
NATIONAL CASUALTY
CORPORATION; TRANSPORT
INDEMNITY COMPANY; UNITED
STATES FIDELITY AND GUARANTY
COMPANY,
*Plaintiffs-Appellants*,

v.

PLANT INSULATION COMPANY,
*Debtor-in-Possession – Appellee*,

No. 12-17466

D.C. No.
3:12-cv-01887-
RS

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, c/o
Sheppard Mullin Richter &
Hampton, LLP,
                    *Defendant-Appellee*,


FUTURES REPRESENTATIVE, The
Honorable Charles B. Renfrew
(Ret.),
        *Real-party-in-interest – Appellee*.


IN RE: PLANT INSULATION CO.,
                            *Debtor*,


FIREMAN'S FUND INSURANCE
COMPANY,
                        *Plaintiff*,


AMERICAN HOME ASSURANCE
COMPANY; GRANITE STATE
INSURANCE COMPANY; INSURANCE
COMPANY OF THE STATE OF
PENNSYLVANIA; INSURANCE
COMPANY OF THE WEST; SAFETY
NATIONAL CASUALTY
CORPORATION; TRANSPORT
INDEMNITY COMPANY; UNITED
STATES FIDELITY AND GUARANTY
COMPANY,
                        *Plaintiffs*,

No. 12-17467

D.C. No.
3:12-cv-01887-
RS


OPINION

And

UNITED STATES FIRE INSURANCE
COMPANY,
*Plaintiff-Appellant*,

v.

PLANT INSULATION COMPANY,
   *Debtor-in-Possession – Appellee*,

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, c/o
Sheppard Mullin Richter &
Hampton, LLP,
   *Defendant-Appellee*,

FUTURES REPRESENTATIVE, The
Honorable Charles B. Renfrew
(Ret.),
   *Real-party-in-interest – Appellee*.

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
April 19, 2013—San Francisco, California

Filed October 28, 2013

Before:  John T. Noonan, Diarmuid F. O'Scannlain,
          and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Bankruptcy

The panel reversed the district court's affirmance of the bankruptcy court's order confirming pursuant to 11 U.S.C. § 524(g) the plan of reorganization of chapter 11 debtor Plant Insulation Co., a corporation that sold asbestos-based insulation.

The panel held that the plan of reorganization did not comply with § 524(g), a provision of the Bankruptcy Code under which a court-appointed fiduciary stands in for future asbestos claimants, and the court ensures that any proposed plan is fair to them.  In the typical § 524(g) plan, present and future asbestos claimants obtain recovery from a trust that is funded by insurance proceeds and securities in the reorganized debtor.  The bankruptcy court enters a series of "channeling injunctions" that prevent any entity from taking legal action to collect a claim or demand that is to be paid by the trust.

Holding that the confirmation of a § 524(g) plan is a core bankruptcy proceeding, the panel reviewed the bankruptcy court's findings of fact for clear error.  The panel held that the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Plant Insulation Co. plan should not have been confirmed because the trust, in connection with which the plan's injunctions were to be implemented, failed to satisfy the requirements of § 524(g).

The panel concluded that § 524(g) permitted the plan's "Settling Insurer Injunction," which barred non-settling insurers from asserting equitable contribution claims against insurers that repurchased insurance policies from Plant under guarantees for complete peace from future litigation. In addition, the injunction was fair and equitable with respect to future asbestos plaintiffs "in light of the benefits provided" to the trust by the settling insurers. The panel held that the bankruptcy and district courts properly observed this standard and, moreover, conscientiously accounted for the rights of the non-settling insurers even though the statute did not explicitly direct the courts to take cognizance of those insurers' interests.

The panel held that the trust to be implemented along with the plan satisfied § 524(g) with regard to the requirement that the trust be "funded" with the securities of the reorganized debtor.

Nonetheless, the plan did not satisfy the requirement that the trust be entitled to own a majority of the voting shares of the reorganized debtor, either after confirmation or at any point where control of the reorganized debtor would meaningfully benefit the trust. The panel vacated the order of the bankruptcy court confirming Plant's plan of reorganization and remanded to the district court with instructions that it remand to the bankruptcy court for proceedings consistent with the panel's opinion.

**COUNSEL**

Robert B. Millner, SNR Denton US LLP, Chicago, IL, Andrew T. Frankel, Simpson Thacher & Bartlett LLP, New York, NY, and Clinton E. Cameron, Troutman Sanders LLP, Chicago, IL, argued the cause for Appellants. Joel T. Muchmore, SNR Denton US LLP, San Francisco, CA, and Clinton E. Cameron filed briefs for the Appellants. With them on the briefs were Paul E. Glad, SNR Denton US LLP, San Francisco, CA, Philip A. O'Connell, Jr., SNR Denton US LLP, Boston, MA, Robert B. Millner and Christopher D. Soper, SNR Denton US LLP, Chicago, IL, Andrew T. Frankel and Mark Thompson, Simpson Thacher & Bartlett LLP, New York, NY, Deborah L. Stein, Simpson Thacher & Bartlett LLP, Los Angeles, CA, Valerie A. Moore and Eugenie Gifford Baumann, Haight, Brown & Bonesteel LLP, Los Angeles, CA, Randall J. Peters, R. Jeff Carlisle, and David K. Morrison, Lynberg & Watkins P.C., Los Angeles, CA, Michael S. Davis, Zeichner Ellman & Krause LLP, New York, NY, Ray L. Wong, Philip R. Matthews and Paul J. Killion, Duane Morris LLP, San Francisco, CA, Lawrence A. Tabb, Musick Peeler & Garrett, Los Angeles, CA, Chad Westfall, Musick, Peeler & Garrett, San Francisco, CA, Clinton E. Cameron and Seth M. Erickson, Troutman Sanders LLP, Chicago, IL.

Steven B. Sacks, Sheppard, Mullin, Richter & Hampton LLP, San Francisco, CA, argued the cause and filed a brief for the Debtor-Appellees. With him on the brief was Michael H. Ahrens, Sheppard, Mullin, Richter & Hampton LLP, San Francisco, CA, Gary S. Fergus, Fergus, A Law Office, San Francisco, CA, James L. Miller, Snyder, Miller & Orton LLP, San Francisco, CA, Peter Van N. Lockwood, Caplin & Drysdale, Chartered, Washington, DC.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a bankruptcy plan, which allegedly leaves a group of insurers paying more than their fair share on a large number of asbestos personal injury claims, complies with the Bankruptcy Code.

I

A

Plant Insulation Co. ("Plant") is a California corporation that was founded in 1937 and made a successful business selling Fiberboard-manufactured asbestos-based insulation through 1971. Beginning in the 1970s, there came a "flood of lawsuits" addressing asbestos-related diseases. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997). These inundated court dockets and swallowed several major companies. From the outset of this crisis through 1989, Plant was defended from this flood by Fibreboard. In the subsequent years, Plant's insurers defended Plant, but one-by-one the insurers announced that Plant's coverage was exhausted. By 2001, no insurer was willing to defend or to indemnify Plant for asbestos claims. When the last insurer bowed out, over 1,500 asbestos-related claims were still pending against Plant. Over 4,000 additional suits were filed against Plant between 2001 and 2006.

At the same time that Plant was struggling with continual asbestos lawsuits, it began to scale back its business operations. In May 2001, Plant's President, Shahram Ameli, who owned 49% of Plant, decided to leave Plant and start his

own insulation contracting business, Bayside Insulation & Construction, Inc. ("Bayside"). At that time, Plant transferred its installation and repair business to Bayside and ceased operations in its own name.

Faced with enormous numbers of asbestos lawsuits, few meaningful assets, no business operations, and no asbestos-injury insurance coverage, Plant went in search of other options. First, to stem the lawsuit tide, Plant negotiated a series of informal standstill agreements with leading members of the California asbestos plaintiff's bar. Next, in early 2001, Plant managed to obtain $35 million in coverage by suing the California Insurance Guarantee Association ("CIGA") under policies Plant had purchased from an insolvent insurance company. Distributions from this fund were made based on a matrix that valued claims according to various metrics. About 1,100 asbestos claimants were paid from this fund, but many more remained.

At some point along the way, Plant decided that its original insurance policies might not be exhausted after all. On January 17, 2006, Plant filed an action against its insurers in a California Superior Court, seeking declaratory relief as to whether the aggregate limits of their policies had truly been exhausted ("the Coverage Action"). The next day, Plant tendered all remaining 3,800 asbestos claims to these insurers. The insurers have defended these claims under a reservation of rights. The Coverage Action remains unresolved.

By this time it was clear that Plant's bankruptcy—in particular, a bankruptcy taking advantage of 11 U.S.C. § 524(g), discussed below—was on the horizon. In September 2006, the asbestos claimants formed an informal

committee (the "Pre-Petition Committee"). The Pre-Petition Committee apparently believed that, in order to ensure that Plant could obtain confirmation of a plan under 11 U.S.C. § 524(g), Plant needed to be resurrected from its current shell into an ongoing and functional business. *See, e.g.*, *In re Combustion Eng'g*, 391 F.3d 190, 248 (3d Cir. 2004) (describing the ongoing business requirement of § 524(g)); *In re W. Asbestos Co.*, 313 B.R. 832, 853–54 (Bankr. N.D. Cal. 2003). Fortuitously, in April 2007, the Pre-Petition Committee learned of Plant's asset transfer to Bayside and notified Bayside that the Committee considered it to be liable for the debts of Plant under theories of successor liability. According to the Pre-Petition Committee, if Bayside did not agree to merge with Plant as part of a contemplated Chapter 11 reorganization, it would face a deluge of successor liability suits. Although there was some initial resistance to the merger,[1] in early 2010, Bayside agreed in principle to a plan under which it would merge with Plant as part of the confirmation of a Chapter 11 plan.

Plant filed for Chapter 11 bankruptcy on May 20, 2009. Plant's only meaningful remaining assets are its insurance policies. These insurance policies are held by Plant either in the form of cash received from insurers who have repurchased the policies from Plant (the "Settling Insurers"), or in the form of the duties of the remaining insurers ("the Non-Settling Insurers") to pay claims of injured persons, which are still under dispute in the Coverage Action. The Settling Insurers repurchased their policies under guarantees for complete peace from future litigation. Such guarantees, embodied in the plan, include protection from contribution

---

[1] When Bayside initially refused, several lawsuits were in fact filed pressing successor liability.

claims that might be brought against them by the Non-Settling Insurers. The bankruptcy court found these guarantees were necessary to incentivize insurers to settle and they form the crux of the disputes in this case.

B

1

Before completing this factual and procedural history, a brief note on 11 U.S.C. § 524(g) would be helpful in understanding the ultimate issues in this appeal. Section 524(g) was enacted in 1994 in light of the approach taken in the celebrated Johns-Manville bankruptcy case. *See In re Thorpe Insulation, Co.*, 677 F.3d 869, 877 (9th Cir. 2012) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)). The Johns-Manville approach refers to the realization that, given the lengthy latency period of asbestos-related diseases, companies facing asbestos risk have no way finally to resolve or even effectively estimate their exposure. Furthermore, if such companies collapse and liquidate, untold numbers of future claimants will be left without recovery. Present claimants, however, want to get paid quickly and efficiently. The Johns-Manville approach, now codified in § 524(g), seeks to use the broad equitable power of the bankruptcy court to resolve the dilemma in a way that is fair for both present and future asbestos claimants.

Under § 524(g), a court-appointed fiduciary stands in for the future asbestos claimants, and the court ensures that any proposed plan is fair to them. 11 U.S.C. § 524(g)(4)(B)(i)–(ii). This is necessary because, under a § 524(g) plan, the bankruptcy court enters a series of "channeling injunctions" that can put an end to all present and

future asbestos litigation by preventing "any entity [from] taking legal action to collect a claim or demand that is to be paid in whole or in part by a trust created through a qualifying plan of reorganization." 4 Collier on Bankruptcy ¶ 524.07. In the typical § 524(g) plan, present and future asbestos claimants obtain recovery from a trust with a pre-planned recovery matrix. The trust is established by the plan and is generally funded by insurance proceeds and securities in the reorganized debtor. In theory, by funding the trust with securities of the reorganized debtor, the trust has an "evergreen" source of value for future asbestos claimants. *In re Combustion Eng'g*, 391 F.3d at 248. There are a number of special requirements a plan must meet for a debtor to obtain § 524(g) injunctive relief.[2]

Today, the original *Johns-Manville* case is a distant memory. Apart from the presence of asbestos liability, Plant's situation could hardly be more different than Johns-Manville's situation in 1989. Unlike Johns-Manville, Plant

---

[2] The requirements for a § 524(g) injunction include: "(1) there must be a notice and a hearing and the 524(g) plan must be in connection with the confirmation of a Chapter 11 plan of reorganization; (2) there must be a trust established to assume the liabilities of the debtor that has been named in asbestos-related actions; (3) the trust must be funded in whole or in part by the securities of at least one debtor and by the obligation of the debtor to make future payments; (4) the trust must own, or be entitled to own, a majority of the voting shares of the debtor, its parent corporation, and any subsidiary; (5) the court must find that the debtor meets certain criteria related to the significance of the threats posed by potential asbestos liability; (6) the court must appoint a legal representative to protect the rights of future claimants against the debtor; and (7) the court must determine that the injunction is fair and equitable with respect to future claims (including a determination that third parties like insurers that come within the protection of the injunction have contributed adequate amounts to the trust)." *Thorpe*, 677 F.3d at 877–78 (citing 11 U.S.C. § 524(g)).

has not been a functioning entity for at least a decade. Furthermore, in stark contrast with the situation facing Johns-Manville, the extent of the insurers' obligations is far from clear. As a result, the plan in this case is entirely different from the Johns-Manville plan and has apparently been proposed in an attempt to fit within the statute. The questions before us today essentially boil down to whether this arrangement passes muster.

2

The proposed bankruptcy plan was initially filed on May 2, 2011. It calls for the creation of a *Johns-Manville*-style trust primarily comprised of funds from the Settling Insurers—approximately $131.5 million in total cash. The Trust will also own equity in the reorganized debtor after it has merged with Bayside; asbestos claimants can seek recovery from the Trust and would be paid out according to a matrix that takes into account many factors about individual claimants.

In a notable deviation from the traditional *Johns-Manville*-style § 524(g) reorganization, the equity interest in the reorganized debtor that the Trust would own is not granted to the Trust as part of the plan; the Trust must purchase the interest. The material terms of the transaction are as follows: (1) The Trust is required to invest $2 million in Bayside, in exchange for which the Trust would obtain a 40% interest in the company—an interest that the bankruptcy court found was worth a mere $500,000; (2) the Trust has a warrant to purchase an additional 11% of Bayside at this set price per share; (3) the Trust would receive a promissory note from Bayside in the amount of $250,000, secured by the shares of other shareholders; (4) the Trust would make a

five-year revolving loan to Bayside in the amount of $1 million; (5) Bayside would perform all the duties that Plant owes to its insurers under the insurance policies, but the Trust will reimburse those costs; (6) the Trust can force Bayside to repurchase the Trust's shares after five years; (7) Bayside has an option to repurchase the Trust's shares for the amount invested by the trust plus simple interest at 10%.

In another deviation from the *Johns-Manville* case and some other § 524(g) cases, asbestos claimants here—whether they seek recovery from the Trust or not—will still be able to pursue claims against Plant/Bayside in the tort system. Any suits against Plant/Bayside are to be tendered to the Non-Settling Insurers. The channeling injunction, instead of completely enjoining these suits, provides that cases can proceed subject to certain limits. Such arrangement, which the Plan Proponents have dubbed an "open system," is necessary because—with the uncertainty surrounding the insurance coverage of any given claim and some insurers refusing to settle—asbestos claimants may not be able to get full recovery from the Trust alone.

In order to provide finality for those insurers who have settled, the plan not only protects them from future asbestos-related liability via the channeling injunction, but also provides for a "Settling-Insurer Injunction" that bars Non-Settling Insurers from asserting equitable contribution claims against Settling Insurers.[3]  It ensures that Settling Insurers

---

[3] In California, when insurance overlaps, every insurer is liable for the whole cost of defending any given claim. *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. Appl. 4th 1279, 1293 (1998). However, insurers have an equitable right to recover the "fair share" of these costs from other insurers that could have been held responsible for the same

cannot be subject to any liability arising out of suits brought pursuant to the open system—even suits from Non-Settling insurers who might have had equitable claims.

The plan also provides narrow protections for the Non-Settling Insurers who may be subject to tort liability in such open system. First, any judgment against a Non-Settling Insurer is to be reduced by any amount previously paid to the claimant by the Trust (the "Trust-Payment Credit"). Second, any judgment against a Non-Settling Insurer is to be reduced by the value of any equitable contribution claim that insurer would have had against any Settling Insurer (the "Judgment-Reduction Credit"). These limits are enforced through the channeling injunction.

The Non-Settling Insurers objected to many aspects of the proposed plan. After a nine-day bench trial, the bankruptcy court overruled all objections. They appealed to the district court, which affirmed confirmation of the plan on October 9, 2012. The Non-Settling Insurers timely appealed to this court.[4]

II

A

We review the bankruptcy court's conclusions of law independently and de novo. *See In re Dominguez*, 51 F.3d

---

claim. *Id.* at 1293, 1297.

[4] The bankruptcy court had jurisdiction under 28 U.S.C. § 157 and § 1334(b). The district court had jurisdiction over the appeal pursuant to 28 U.S.C. § 158. This court has jurisdiction under 28 U.S.C. § 158(d).

1502, 1506 (9th Cir. 1995). The standard of review to be applied to the bankruptcy court's findings of fact was disputed at the district court and remains in dispute here. When the bankruptcy court is engaged in a "core proceeding," its decision is a final decision and its factual findings are reviewed for clear error. *In re Harris*, 590 F.3d 730, 736 (9th Cir. 2009). However, when the bankruptcy court adjudicates a "non-core" matter, it only has the power to make "proposed findings of fact and law" that a district court must review de novo. *Id.* at 736–37; *see also* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033. 28 U.S.C. § 157(b)(2) exhaustively lists all "core proceedings." Included in that list is "confirmations of plans." 28 U.S.C. § 157(b)(2)(L). For this reason, the district court reviewed the bankruptcy court's findings for clear error only.

The Non-Settling Insurers argue that confirmation of a § 524(g) plan is a non-core proceeding and findings of fact made there should be treated as only "proposed findings" under 28 U.S.C. § 157(c)(1). To support their argument, they assert that § 524(g) plans have a unique requirement—for their injunctions to be "valid and enforceable" they must be issued in connection with a plan "issued or affirmed by the district court." 11 U.S.C. § 524(g)(3)(A).[5] Thus, according to the Non-Settling Insurers, § 524(g) confirmations by bankruptcy courts cannot be final decisions and must be reviewed de novo.

---

[5] To the extent the Non-Settling Insurers attempt a constitutional argument about the inherent power of Article I judges by dropping a single citation to *Stern v. Marshall*, 131 S.Ct. 2594 (2011), it is insufficiently developed and waived. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curium) ("[J]udges are not like pigs, hunting for truffles buried in briefs.").

The requirement in § 524(g)(3)(A) that the plan be "issued or affirmed by the district court" is insufficient to overcome the plain language of 28 U.S.C. § 157(b)(2)(L) indicating that plan confirmations are final decisions. In light of this clear directive § 524(g)(3)(A) does not create an exception. Indeed, the phrase "issued or affirmed" in § 524(g)(3)(A), read literally, indicates that the review required by this section is in the posture of an appellate court. *See Black's Law Dictionary* 64 (8th ed. 1999) (defining affirm as "[t]o confirm (a judgment) on *appeal*" (emphasis added)). We are satisfied that such subsection does not categorically undermine the general rule that plan confirmations are final decisions.

As such, the district court did not err in reviewing the bankruptcy court's findings of fact for clear error. We apply the same standard in our review. *In re Dominguez*, 51 F.3d at 1506.

B

One of the key features of the plan is its Settling Insurer Injunction. The bankruptcy court found that "settlement with insurers is the only means by which the objectives of section 524(g) can be advanced in the present case." Further, the bankruptcy court found that in order to persuade insurers to settle, they need to be able to obtain finality from the settlement. Without this feature, Settling Insurers would always be exposed to indirect asbestos liability through contribution suits. There would never be finality, the Trust would be underfunded, and asbestos claimants would continue to suffer from the vagaries of the tort system.

To be sure, cutting off the contribution rights of Non-Settling Insurers is not without cost.  The bankruptcy court explicitly found that the Non-Settling Insurers' equitable contribution rights are "valuable" and "generally enforced." Although all parties agree that the Non-Settling Insurers are fully compensated for cases that go to judgment by the Judgment-Reduction Credit and Trust-Payment Credit, the Non-Settling Insurers strongly argue that they are losing substantial value in cases that are settled or dismissed without payment.[6]

The Non-Settling Insurers proposed a solution—a "trust backstop," which would pay Non-Settling Insurers a 100% dividend on equitable contribution claims directly out of the Trust.[7]  The bankruptcy court concluded that such a backstop would "overcompensate" Non-Settling Insurers and was unnecessary for the plan to meet the requirements of the Code.  The bankruptcy court expressed concern for the possibility that such a backstop would deplete the amount of the trust available for asbestos claimants and indicated that "[a]ny provision which takes money away from the trust . . .

---

[6] The bankruptcy court found that the Non-Settling Insurers would lose little, if any, rights with regard to cases that are settled because settlement values will be influenced by the possibility of judgments being reduced by the Credits.  With regard to dismissed claims, the court did not make a specific finding as to the amount that is actually at stake.  The Non-Settling Insurers' expert estimated that costs of addressing dismissed claims accounted for 50% of defense expenditures from 2006–09.  Even if this number is a wild overestimation, the Plan Proponents do not argue that defense costs of dismissed claims are insignificant or negligible.

[7] Such a backstop was a part of the plan under contemplation in *In re Thorpe Ins. Co.*, 677 F.3d at 878–79.

should be imposed only where required by the statute or the Constitution."

Fundamentally, this is the conclusion with which the Non-Settling Insurers take issue. First, they argue that the statute does not permit the injunctions provided for in this case. But even if it does, the Non-Settling Insurers assert that general principles of equity, bankruptcy, and federal common law limit the bankruptcy court's power to issue injunctions that sweep away the rights of third parties against non-debtors.

1

There is little question that few legislative sponsors in Congress would have contemplated the enjoining of equitable contribution claims when they drafted § 524(g). The section was originally drawn to create a procedure "modeled on the trust/injunction in the Johns-Manville case" and to "strengthen the Manville . . . trust/injunction mechanism . . . ." H.R. Rep. No. 103-835, at 40–41 (1994). The channeling injunction in *Johns-Manville* only enjoined asbestos health claims; there was no need to enjoin anything else. *Johns-Manville Corp.*, 843 F.2d at 640.

The Non-Settling Insurers[8] argue that a § 524(g) injunction's permissible scope is not much broader than the *Johns-Manville* case and does not permit any injunction protecting insurers from contribution claims. As with every

---

[8] We recognize that this particular challenge is raised by only one Non-Settling Insurer, the Fire Insurance Company. The remaining Non-Settling Insurers have forfeited this argument. For simplicity's sake in this already-too-complicated case, we treat them as one and the same.

statute, we start with the text. "If the statutory language is unambiguous and the statutory scheme is 'coherent and consistent,'" judicial inquiry must cease. *In re Ferrell*, 539 F.3d 1186, 1190 n.10 (9th Cir. 2008) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). Section 524(g)(1)(B) states:

> An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid **in whole or in part** by a trust . . . (emphasis added).

According to Non-Settling Insurers, contribution claims against Settling Insurers are not to be paid "in whole or in part" by the trust because they are not claims against the debtor. Rather, they are claims against other insurance companies.

Although such language is far from clear, we think that the Non-Settling Insurers are misreading the statute's text. The phrase "with respect to" is generally understood to be synonymous with the phrases "relating to," "in connection with," and "associated with." *See Huffington v. T.C. Group, LLC*, 637 F.3d 18, 22 (1st Cir. 2011) (citing several dictionaries). Thus, it is eminently reasonable to paraphrase the statute as follows: "an injunction may be issued to enjoin entities from taking legal action for the purpose of collecting any payment related to a claim or demand that is to be paid in whole or in part by the trust." Furthermore, equitable contribution claims are, themselves, components of asbestos

claims which are the kind of claim that the trust does pay. That they are formally brought against different parties does not change the kind of claim that they are. At minimum, we are satisfied that such claims are "legal action for the purpose" of recovering "with respect to" asbestos claims.

Such interpretation is bolstered by the fact that it is more consistent with the statutory scheme, which explicitly contemplates enjoining claims against the debtor's insurers:

> (4)(A)(i) Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.
>
> (ii) Notwithstanding the provisions of section 524(e), **such an injunction may bar any action directed against a third party** who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor **to the extent such alleged liability of such third party arises by reason of**—
>
> . . .
>
> > (III) the third party's provision of insurance to the debtor or a related party. . .

11 U.S.C. § 524(g)(4)(A) (emphasis added).  The injunction may bar "any action" against a third party that is alleged to be directly or indirectly liable for the conduct of the debtor, including if their liability arises by reason of their provision of insurance.  The Settling Insurers' equitable contribution liability is indirect liability arising by reason of their provision of insurance to the debtor, so it easily falls within this section.

Therefore, we agree with the lower courts' conclusion that the statute permits this injunction.

2

Although we have concluded the statute permits an injunction protecting the third-party Settling Insurers, it remains unclear whether it places attendant limits on the bankruptcy court's power to enter such an injunction.  The parties generally agree that the Non-Settling Insurers lose some valuable rights without full compensation.  They strongly disagree on whether any compensation is required.  The Plan Proponents argue that § 524(g) contains no language indicating that enjoined parties need be compensated: this statutory silence they interpret as a generally unconstrained authority for the bankruptcy court to issue these injunctions.

The bankruptcy court agreed with the Plan Proponents concerning the absence of statutory limits on its power, but held itself bound by "the principles and rules of equity jurisprudence."  *Young v. United States*, 535 U.S. 43, 50 (2002) (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)).  The court weighed the Non-Settling Insurers' under-compensation against the "goals of  § 524(g)."  After

determining that the Non-Settling Insurers would lose only a relatively small portion of the value of their contribution rights, and that the proposed alternative would undermine the purposes of the statute, the bankruptcy court deemed the principles of equity satisfied. In turn, the Non-Settling Insurers argue that these principles of equity demand full compensation for their loss of rights.

The Non-Settling Insurers point primarily to cases outside the § 524(g) context to support their view that equity requires "full compensation" for their forfeited rights. Most significantly, the Non-Settling Insurers highlight the so-called *Dow Corning* factors. *See In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002). *Dow Corning* involved a mass-tort bankruptcy driven primarily by breast-implant products-liability litigation. *Id.* at 653. Invoking the bankruptcy court's general equitable powers, *see* 11 U.S.C. § 105(a), the *Dow Corning* plan enjoined future actions against the company's insurers or shareholders arising out of tort claims. 280 F.3d at 655. Noting that enjoining a non-consenting creditor's claim against a non-debtor is "a dramatic measure to be used cautiously," the court surveyed the cases approving such injunctions and concluded that seven factors must be present. The factors are:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the

debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* at 658. The Non-Settling Insurers in particular emphasize factors five and six, which require full compensation.

A common theme in the cases on which both the Non-Settling Insurers and *Dow Corning* itself relied is that they do not involve asbestos or injunctions under § 524(g). The standards developed in *Dow Corning* and applied by other courts are judge-made rules constraining the bankruptcy court's powers exercised under its general equitable authority, *see* 11 U.S.C. § 105(a). In contrast, the plain language of § 524(g) explicitly permits injunctions of the Non-Settling Insurers claims and nowhere provides for any compensation for their lost rights.

That there is no statutory protection for the Non-Settling Insurers' contribution claims is emphasized by § 524(g)(4)(B)(ii). This clause states that the § 524(g) injunction, to be enforceable, must be "fair and equitable with respect to [future claimants], in light of the benefits provided, or to be provided, to such trust on behalf of [a party protected

by the injunction]."   In enacting this subsection, Congress articulated a clearer standard for weighing the equities in the context of an asbestos-related bankruptcy.   The statute specifies two classes of persons whose interests the courts must attentively evaluate before issuing an injunction.  In the first place, there are the most obvious stakeholders whom the Plan must regard solicitously: the future asbestos plaintiffs, those who may "subsequently assert such demands [i.e., those demands that are described in the Plan and are 'to be paid in whole or in part from the trust']."   *Id.* (cross-referencing § 524(g)(4)(B)).  But the statute instructs the court to focus on another set of actors—a set that includes the debtor and "such third part[ies]" as its insurers—and to account for "the benefits [they have] provided . . . to [the] trust" in exchange for enjoining future claims against them. *Id.*  In other words, before it may issue an injunction under § 524(g), a court must ensure that the remedy be "fair and equitable" to future asbestos plaintiffs (the parties to be enjoined) when viewed in comparison to the benefits provided by the bankrupt and its insurers (the parties to be benefitted by the injunction).

Section 524(g), unlike the general provision of § 105(a), gives the bankruptcy courts more detailed guidance in the exercise of their equitable powers.   In crafting these more specific instructions, Congress has not commanded that the interests of other third parties, such as the Non-Settling Insurers in this case, enter into the calculus.

In any event, however, the bankruptcy court did carefully weigh the benefits of the channeling injunctions against the loss of the Non-Settling Insurers' rights.  The district court even noted that the Plan generally conformed to the rigorous standard for enjoining creditors' claims enunciated in *Dow Corning*.   Appellants claim that this standard requires "a

mechanism to pay for all, or substantially all" the rights of third parties that the injunction extinguishes. But the Plan confirmed by the bankruptcy court provides not unsubstantial protection for the Non-Settling Insurers, in the form of the Trust-Payment Credit and Judgment-Reduction Credit, as outlined above. Despite these safeguards, the Plan may not fully compensate the Non-Settling Insurers for the cost of defending tort claims that it settles prior to judgment—and, since most such claims do not proceed to trial, these expenses are by no means trivial. The bankruptcy court nevertheless determined that, in light of the purposes of § 524(g), enjoining the Non-Settling Insurers' contribution claims was "fair and equitable" to future asbestos plaintiffs and, in providing the finality and protection from future suit, supplied the necessary incentive for insurers to settle in the first place. This inquiry sufficiently satisfies the statutory scheme.

Thus, we conclude that, in order for the Plan to be confirmable, the injunction needs to be "fair and equitable with respect" to future asbestos plaintiffs "in light of the benefits provided" to the Trust by the Settling Insurers. The bankruptcy and district courts properly observed this standard and, moreover, conscientiously accounted for the rights of the Non-Settling Insurers whose interests the statute did not explicitly direct them to take cognizance.

C

Section 524(g) imposes a number of substantive requirements on the trust that is to be implemented along with the plan:

(i) the [§ 524(g)] injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization–

(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

(III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of–

(aa) each such debtor;

(bb) the parent corporation of each such debtor; or

(cc) a subsidiary of each such debtor that is also a debtor; and

(IV) is to use its assets or income to pay
claims and demands

11 U.S.C. § 524(g)(2)(B)(i).  The Non-Settling Insurers argue
that the court erred in finding that the trust met these
conditions with regard to: (1) the requirement that the trust be
"funded" with the securities of the reorganized debtor, *see*
11 U.S.C. § 524(g)(2)(B)(i)(II), and (2) the requirement that
the trust be entitled to own a majority of the voting shares of
the reorganized debtor.  *See* 11 U.S.C. § 524(g)(2)(B)(i)(III).

1

As part of the plan in this case, the trust will acquire
approximately $500,000 worth of equity—40% of
Bayside—in the reorganized debtor in exchange for
$2,000,000.  In addition, the trust will also obtain a $250,000
note from the reorganized debtor and a warrant to purchase an
additional 11% of the company at the same price as the
original sale.  The bankruptcy court concluded that such
arrangement satisfied § 524(g)'s requirement that the trust be
"funded in whole or in part" by the securities of the
reorganized debtor.

The Non-Settling Insurers disagree.  They argue that the
statute's statement that the debtor "fund" the trust necessarily
entails a positive contribution.  By removing $2,000,000 in
cash from the trust in exchange for $500,000 in equity, they
assert that the trust is actually "de-funded" by Bayside.

The bankruptcy and district courts' reading of the word
"fund" indeed may seem counterintuitive.    Standard
dictionary definitions apparently confirm this common-sense
observation: the first two entries in *Merriam-Webster's*

explain that "fund" denotes a "provision of resources" or the "provi[sion] of funds" or the "place[ment] in a fund." *Merriam-Webster's Collegiate Dictionary* 507 (11th ed. 2003). Arguably no such "funding" in a meaningful way can occur when, on net, value flows out of the trust.

But situating the term in its proper legal context dispels much of the conceptual haze that surrounds our everyday and often equivocal usage. The statute imposes the requirement that the *trust* "be funded in whole or in part by securities" of the debtor, 11 U.S.C. § 524(g)(2)(B)(i)(II): in other words, these securities will comprise the *trust fund* to be held and managed by a fiduciary for the benefit of the asbestos claimants. According to its technical sense, "trust fund" is simply the "property held in a trust by a trustee" or the "corpus," *Black's Law Dictionary* 1554 (8th ed. 1999), which is further defined as the "property for which a trustee is responsible," *id.* 368. Section 524(g) refers to "fund" in the context of a trust, permitting the reasonable inference that the term assumes this specific meaning peculiar to, but also familiar and well defined in, the law of trusts. Reading the statute in light of this background suggests that the trust in this case, whose corpus comprises securities of the reorganized debtor, satisfies the requirement. Regardless of how much value flows in and out of the trust according to the Plan, the fiduciary will end up retaining in the "trust fund" or "corpus" the statutorily mandated securities.

This reading of the "funding" requirement, furthermore, accords with the larger context and purpose of the statute. Courts have recognized that § 524(g) embodies the requirement that the reorganized debtor becomes a "going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future

asbestos claimants." *In re Combustion Eng'g, Inc.*, 391 F.3d at 248 (citing 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the Trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")).

To meet this requirement, all that this particular subsection must accomplish is to ensure that the Trust receives a stake, of some value, in the reorganized debtor. The Trust must get a piece of the "goose that lays the golden eggs," i.e., Bayside.  Here, this requirement is met.

In contrast, the requirement suggested by the Non-Settling Insurers—that the bankruptcy court conduct an inquiry centered around whether the trust obtained a fair deal in the transaction to acquire those securities—is plainly embodied elsewhere in the statute, such as the requirements of good faith (11 U.S.C. § 1129(a)(3)) or the requirement that the court ensure the injunction is "fair and equitable" (11 U.S.C. § 524(g)(4)(B)(ii)).  Furthermore, as the bankruptcy court recognized, the Trust is getting a valuable asset from the debtor that dwarfs anything Bayside could provide—over one hundred million dollars in insurance settlement proceeds. The insurance proceeds are what is really "funding" the Trust, in the sense of that word that the Non-Settling Insurers advance.

Finally, requiring that the Trust obtain a "fair deal" on the acquisition of these securities would strain the competence of the bankruptcy court; as the district court noted below: "[i]n many cases . . . shares in a privately-held company, and particularly one that has recently emerged from bankruptcy, are of relatively uncertain value." This inherent uncertainty makes it less likely that this section requires the bankruptcy court to weigh the value of the shares that the trust receives from the debtor.

Therefore, we are satisfied that the Trust's purchase of securities in the reorganized debtor meets the requirements of 11 U.S.C. § 524(g)(2)(B)(i)(II).

2

Section 524(g)(2)(B)(i)(III) states that, in order to be confirmable, a trust must "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares [of the reorganized debtor]." The bankruptcy court found that this requirement was met because the Trust can gain 51% ownership of Bayside in two different ways: (1) the Trust can use its outstanding warrant to purchase an additional 11% of the shares of Bayside at the same price it was originally forced to purchase the shares at; or (2) if Bayside defaults on the $250,000 note, it is secured by enough outstanding stock in Bayside to bring the Trust's ownership to 51%. The Non-Settling Insurers contend that these conditions are illusory, that they offer only technical compliance with the literal terms of the statute, and are rendered irrelevant by Bayside's standing warrant to repurchase shares from the Trust at the original price plus 10% simple interest.

The question at issue is the meaning of the phrase "if specified contingencies occur." Nowhere in the statute is this phrase defined. Nothing in the statute limits the sort or nature of the contingencies that would suffice to satisfy this section. As a result, the Plan Proponents contend (and the bankruptcy court agreed) that any contingency suffices: as long as some circumstances are listed in the plan that would, through the exercise of rights granted in the plan, give the trust the ability to gain majority control of the reorganized debtor, this section is satisfied. The nature of the circumstances, their impossibility, or their value to the trust is irrelevant.

But such a reading of "specified contingencies" would render this entire subsection a nullity. If "specified contingencies" could include any contingency—such as a meteor hitting the Empire State Building—then the subsection has no content because the plan drafters could write it out of existence at will. This is not a fair reading of this phrase. *See In re Congoleum Corp.*, 362 B.R. 167, 176 (Bankr. D.N.J. 2007) (declining to interpret this subsection in a way that would produce an "entirely illogical result").

Reading such phrase in the context of the remainder of the statute's text, considering the statute's purpose and context, illuminates its true meaning. First, the language of § 524(g)(2)(B)(i)(III) uses the key phrase "voting shares." This is significant because it signals that this section is about control over the reorganized debtor's future operations. *In re Congoleum Corp.*, 362 B.R. at 176. Second, the design of § 524(g) reveals that this subsection is a key piece governing the relationship of the trust to the reorganized debtor. It is one of only four requirements that § 524(g) places on the trust. The other three require the trust: (1) to assume the liabilities of the debtor for asbestos actions; (2) to be at least

partially funded by equity in the debtor; and (3) to use trust assets or income to pay asbestos claimants.  Read together, these requirements are part of a scheme that ensures that, after the bankruptcy, the trust stands in for the debtor with regard to asbestos claims and the debtor continues to operate its business for the benefit of the trust.  This design is thwarted if a plan can make control of the debtor effectively impossible.

The history of § 524(g) also suggests that this subsection is not to be lightly discarded.  In the model Johns-Manville bankruptcy, the trust came out of the bankruptcy with 80% of Johns-Manville's common stock.  *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986).  Indeed, taking less than 100% of the common stock was viewed as a "significant concession" by the Asbestos Health Committee at the time. *In re Johns-Manville Corp.*, 66 B.R. 517, 529–30 (Bankr. S.D.N.Y. 1986).  It strains credulity to believe that, against this backdrop, Congress would have drafted such a toothless provision.

We conclude that "specified contingencies," read in this context, refers to contingencies regulated by the bankruptcy court to ensure that control is either a realistic possibility or a backstop to trust insufficiency.  The plan can still "specify" what contingencies suffice, but those contingencies cannot be "shams" that allow control facially, but not in practice.  To the extent Congress has provided an exception to the general rule that the trust should control the reorganized debtor, the overarching goal—that asbestos claimants get paid to the full possible extent—informs that exception.  The leading treatise has endorsed this reading of the statute.  4 Collier on Bankruptcy ¶ 524.07 (16th ed. 2013) ("This provision is to ensure that, if there are not sufficient funds in the trust

otherwise, the trust may obtain control of the debtor company.").[9]

The "contingencies" currently in the plan clearly do not meet this standard. A mere right of the plan to purchase shares ordinarily will not suffice; a trust that is struggling to pay claims cannot be expected to purchase control of the reorganized debtor and such a right leaves the trust in scarcely a better position than a third party. *See In re W. Asbestos Co.*, 313 B.R. at 852 n.28 (rejecting the right of the plan to purchase shares at fair market value as not complying with 11 U.S.C. § 524(g)(2)(B)(i)(III)). This is especially true where, as here, the price the Trust would have to pay is fixed at roughly four times the current value of the equity.

The note-default condition also fails to comply with the statute. This is fundamentally identical to the "contingency" rejected in *Congoleum*, and we reject it for the same reason: if a reorganized debtor were to "default on such insignificant payments, it is essentially insolvent, making the value of the shares negligible . . . . This cannot be the kind of contingency Congress envisioned when it drafted § 524(g)(2)(B)(i)(III)." *Congoleum*, 362 B.R. at 179.

Because the present plan does not call for the Trust to control the reorganized debtor either after confirmation or at

---

[9] It is easy to imagine what contingencies might suffice. Most straightforwardly, a contingency that promised to transfer control to the trust in the event that it proved insufficient would clearly comply with this provision. A buyout right could be satisfactory, if that right placed the trust at an advantage such that it could use that right to claim value. Either of these would be consistent with the purpose of this section: to ensure the reorganized debtor continues to operate for the benefit of asbestos claimants.

any point where control would meaningfully benefit the Trust, it does not comply with § 524(g).

### III

We conclude that the bankruptcy court erred in confirming the Plan and the district court erred in affirming that judgment. The Plan should not have been confirmed because the Trust, in connection with which the Plan's injunctions were to be implemented, failed to satisfy the requirements of § 524(g). We therefore vacate the order of the bankruptcy court confirming Plant Insulation's Restated Second Amended Plan of Reorganization, and remand to the district court with instructions that it remand to the bankruptcy court for proceedings consistent with this opinion.[10]

**REVERSED AND REMANDED with instructions.** The parties shall bear their own costs.

---

[10] The other challenges raised by the Non-Settling Insurers are addressed in a memorandum disposition filed concurrently with this opinion.