PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1208
_____

In re: W.R. GRACE & CO., et al,
                              Reorganized Debtors


CONTINENTAL CASUALTY COMPANY;
TRANSPORTATION INSURANCE COMPANY

v.

JEREMY B. CARR, et al.

                    Jeremy B. Carr, et al.
                              Appellants
_____

On Direct Appeal from the United States Bankruptcy Court
for the District of Delaware
(Bankruptcy Case No. 01-bk-01139)
(Bankruptcy Adv. No. 15-ap-50766)
Bankruptcy Judge: Honorable Kevin Gross
Bankruptcy Judge: Honorable Kevin J. Carey
_____

Argued March 6, 2018

Before: MCKEE, AMBRO, and RESTREPO, Circuit Judges

(Opinion filed: August 14, 2018)

Michael Busenkell
Gellert Scali Busenkell & Brown
1201 North Orange Street, Suite 300
Wilmington, DE 19801

Daniel C. Cohn        [Argued]
Taruna Garg
Murtha Cullina
99 High Street, 20th Floor
Boston, MA 02110

Allan M. McGarvey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
        *Counsel for Appellants*


Brian T. Burgess
Michael S. Giannotto        [Argued]
Goodwin Procter
901 New York Avenue, N.W.
Suite 900 East
Washington, DC 20001

Scott D. Cousins
Evan T. Miller
Bayard P.A.
600 North King Street, Suite 400
Wilmington, DE 19801
        *Counsel for Appellees*

Robert M. Horkovich
Anderson Kill
1251 Avenue of the Americas
42nd Floor, 41-154W
New York, NY 10020

Edward J. Longosz, II
Mark A. Johnston
Kennedy L. Cabell
Eckert Seamans Cherin & Mellott
1717 Pennsylvania Avenue, N.W., 12th Floor
Washington, DC 20006

Jeffrey C. Wisler
Connolly Gallagher
1000 West Street
The Brandywine Building, Suite 1400
Wilmington, DE 19801
        *Counsel for Amici Appellees*

_____

OPINION OF THE COURT
_____

AMBRO, Circuit Judge

Mass-tort liability of entities with asbestos operations typically results in their filing for bankruptcy protection. The Bankruptcy Code allows a court to supplement a confirmed plan of reorganization by entering an injunction that channels this liability to a trust set up to compensate persons injured by the debtor's asbestos.

In certain circumstances, channeling injunctions can also protect the interests of non-debtors, such as insurers. The question we answer is whether the claims of plaintiffs in litigation begun in Montana (the "Montana Plaintiffs" or simply "Plaintiffs") fit a channeling injunction's coverage.

The Plaintiffs are a group of individuals suffering from asbestos disease as a result of exposure to the asbestos mining and processing operations in Libby, Montana (the "Libby Facility") of W.R. Grace & Co. and its related entities (collectively "Grace"). They seek to hold Grace's insurers, Continental Casualty Company and Transportation Insurance Company (collectively "CNA"), liable under various state-law negligence theories for their injuries (the "Montana Claims"). CNA, however, seeks to enforce a third-party-claims channeling injunction (the "Injunction") entered under Grace's confirmed plan of reorganization (the "Grace Plan") to bar the Montana Plaintiffs' action.

As the Montana Claims fit the text of the Injunction and are not excluded from it, we affirm the Bankruptcy Court's decision as it pertains to this issue. We do not decide, however, whether it could bar the Montana Claims within the limits of 11 U.S.C. § 524(g)(4). Instead, we vacate this portion of the Court's decision and remand for it to make this determination per the guidelines we note.

4

## I.  Background

### A.  Channeling of Third-Party Claims in Asbestos Bankruptcy

Section 524(g) of the Bankruptcy Code authorizes bankruptcy courts to form a trust and issue an injunction to channel certain claims to that trust in conjunction with a confirmed plan of reorganization in asbestos bankruptcies. *In re Quigley Co., Inc.*, 676 F.3d 45, 48 (2d Cir. 2012); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 n.46 (3d Cir. 2004), *as amended* (Feb. 23, 2005). The injunction bars asbestos-related actions against the debtor and claims against certain third parties who are alleged to be directly or indirectly liable for the debtor's conduct along with claims or demands against it. §§ 524(g)(1)(B), (4)(A)(ii). Instead, those actions are directed to the trust, "generally funded by insurance proceeds and securities in the reorganized debtor," which assumes the asbestos liabilities. *In re Plant Insulation Co.*, 734 F.3d 900, 906 (9th Cir. 2013); *see also In re W.R. Grace & Co.*, 729 F.3d 311, 315 (3d Cir. 2013); *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 360 (3d Cir. 2012); *In re Thorpe Insulation Co.*, 677 F.3d 869, 877 (9th Cir. 2012), *as amended* (Apr. 3, 2012).

Congress intended § 524(g) to address the "unique problems and complexities associated with asbestos liability," *Combustion Eng'g*, 391 F.3d at 234, particularly the "long latency period of many asbestos-related diseases, which . . . typically creates a large pool of future claimants whose disease has not yet manifested." *W.R. Grace*, 729 F.3d at 323; *see also Plant Insulation*, 734 F.3d at 905–06; *Quigley*, 676 F.3d at 58–59; H.R. Rep. No. 103-835, at 40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348. The statute "seeks to use the broad equitable power of the bankruptcy court to resolve th[is] dilemma in a way that is fair for both

5

present and future asbestos claimants." *Plant Insulation*, 734 F.3d at 906. It "allows companies to emerge from bankruptcy free of asbestos liability," *W.R. Grace*, 729 F.3d at 315, and to "facilitate[] [their] ongoing viability, which in turn provides . . . trust[s] with an 'evergreen' source of funding to pay future claims," *id.* at 320 (citing *Combustion Eng'g*, 391 F.3d at 234) (quotation marks omitted). Many statutory prerequisites designed to ensure fairness must be met before a trust is formed and a channeling injunction entered under § 524(g). *Combustion Eng'g*, 391 F.3d at 234 n.45 (describing statutory prerequisites under §§ 524(g)(2)(B)(i)(I)–(IV), (ii)(I)–(V)); *see also W.R. Grace*, 729 F.3d at 320.

Relevant here is the injunction and channeling of certain actions against CNA as a third party. Under § 524(g)(4)(A)(ii),

> [a third-party-claims channeling] injunction may bar any action directed against a third party who is identifiable from the terms of such injunction . . . and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer,

6

director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party[.]

*Id.* Gateway keys are whether the third parties are identifiable (as opposed to specifically identified) by the injunction and whether the liability results, even if indirectly, from the debtor. Protecting third parties like CNA against actions alleging derivative liability "provide[s] [them with] an incentive . . . to contribute to the trust." *Quigley*, 676 F.3d at 59. They are provided this incentive because continued exposure to indirect asbestos claims would create a "lingering uncertainty regarding the scope of [their] liability [that] would threaten the debtor's recovery and hinder Congress's objective of providing an 'evergreen' source of funding to pay future claims." *W.R. Grace*, 729 F.3d at 325 (citing *Combustion Eng'g*, 391 F.3d at 234) (quotation marks omitted).

## B. Facts

We have previously discussed extensively the facts surrounding Grace asbestos operations and its bankruptcy. *In re W.R. Grace & Co.*, 729 F.3d 332, 335–39 (3d Cir. 2013); *In re W.R. Grace & Co.*, 532 F. App'x 264, 265–66 (3d Cir. 2013); *In re W.R. Grace & Co.*, 591 F.3d 164, 167–70 (3d Cir. 2009); *In re W.R. Grace & Co.*, 316 F. App'x 134, 135–36 (3d Cir. 2009); *In re W.R. Grace & Co.*, 115 F. App'x 565,

7

566 (3d Cir. 2004). So we include here only the pertinent undisputed facts taken largely from the Bankruptcy Court's decision. *See In re W.R. Grace & Co.*, No. 01-01139, 2016 WL 6068092, at *1–4 (Bankr. D. Del. Oct. 17, 2016).

CNA issued a variety of insurance policies to Grace between 1973 and 1985, including policies for workers' compensation and employers' liability (collectively the "Workers' Compensation & Employers' Liability Policies" or "CNA Policies").[1] *See* Statement of Undisputed Material Facts of Continental Casualty Company and Transportation Insurance Company in Support of Motion for Summary Judgment ("CNA SUF") ¶ 20, In re W.R. Grace & Co., 2016 WL 6068092 (No. 01-01139). Within the latter group of CNA Policies, CNA is granted the right to inspect the Libby Facility:

> **Inspection and Audit:** [CNA] . . . shall . . . be permitted but not obligated to inspect at any reasonable time the workplaces, operations, machinery and equipment covered by this policy. Neither the right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of [Grace] or others, to determine or warrant that such workplaces, operations,

---

[1] The CNA Policies relevant to this appeal are the Workers' Compensation & Employers' Liability Policies No. WC 1205050R (1973–76) and No. WC 159 9420 (1977–85). We do not see the relevance of CNA Policy No. WC 5 07415909 (1991–92) issued by the Transportation Insurance Company (a CNA Company) because the Libby Facility was closed in 1990 and the policy applies only to injuries that occurred during the policy period.

8

machinery or equipment are safe or healthful, or are in compliance with any law, rule or regulation.

Workers' Compensation & Employers' Liability Policies No. WC 1205050R (1973–76) at ¶ 4, No. WC 159 9420 (1977–85) at ¶ 4 (emphasis in original).

After Grace filed voluntary chapter 11 petitions in the District of Delaware, the Bankruptcy Court confirmed the Grace Plan. It included the Injunction under § 524(g) barring certain suits against third parties and instead channeling them to an asbestos personal injury trust (the "Asbestos PI Trust") designed to compensate those injured by Grace's asbestos. The Injunction states in pertinent part:

On and after the Effective Date, the sole recourse of the Holder of an Asbestos PI Claim . . . shall be to the Asbestos PI Trust . . .[,] and such Holder shall have no right whatsoever at any time to assert its Asbestos PI Claim . . . against . . . any other Asbestos Protected Party . . . . [A]ll such Holders permanently and forever shall be stayed, restrained, and enjoined from taking any and all legal or other actions or making any Demand against any Asbestos Protected Party . . . for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos PI Claims . . . other than from the Asbestos PI Trust . . . .

It applies "only to the extent[] provided by [§] 524(g) . . . ." Excluded from the Injunction's reach are "rights or obligations [that] pertain solely to coverage for" "[c]laim[s]

9

. . . for benefits under a state[-]mandated workers' compensation system."

Along with the Grace Plan, CNA and Grace entered into a settlement agreement (the "Settlement Agreement") in which CNA agreed to contribute $84 million over a period of six years to the Trust, $13 million of which could be reimbursed for any payments CNA makes for asbestos personal injury claims that are not successfully channeled to the Trust.

### C.     Procedural History

Plaintiffs filed the Montana Claims in that State against CNA, *see* CNA SUF ¶ 38, alleging it breached a duty of care. Specifically, the Montana Claims allege:

> 161. CNA was negligent in [its] undertaking to provide [industrial hygiene] services:
>
> (a) in failing to recommend or require sufficient measures and standards for employee education, warning the workers, their families and the community, protection against asbestos dust going into workers' homes and into the community, dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance) and medical monitoring;
>
> (b) in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;
>
> (c) in failing to obtain medical information on the incidence of disease and deaths at the Grace operations from Grace and from public agencies; and

(d) in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

162. CNA's representatives with expertise in industrial hygiene inspected the Grace Libby operations.

163. In so doing, CNA had a duty of reasonable care to the Libby workers, their families and to the community.

164. CNA was negligent in inspection of the Grace Libby operations, in failing to report and act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, their families and to the community, insufficient dust control . . . , and insufficient medical monitoring.

165. As a direct and proximate result of the negligence of CNA, Plaintiffs have suffered from asbestos[-]related bodily injuries and incurred the damages alleged herein.

CNA filed a complaint in the Bankruptcy Court seeking a declaratory judgment that the Montana Claims fall under the Injunction and accordingly must be enjoined and channeled to the Trust. The Montana Plaintiffs filed a motion to dismiss and CNA filed a motion for summary judgment. The Asbestos PI Trust filed a brief as *amicus curiae* in support of CNA. The Court, after hearing oral argument on the motions, decided the Montana Claims must be enjoined and thus denied the Montana Plaintiffs' motion to dismiss and granted summary judgment to CNA. *W.R. Grace*, 2016 WL 6068092, at *1.

11

First, the Court considered whether the language of § 524(g)(4)(a) limits the scope of the Injunction such that it does not bar the Montana Claims. It separately addressed (1) whether the Montana Claims allege CNA is directly or indirectly liable for the conduct of, claims against, or demands on Grace, and (2) whether the alleged liability exists "by reason of" CNA's providing insurance to Grace.

In answering the former, the Court relied on our opinion in *Combustion Engineering*, 391 F.3d 190, and the Bankruptcy Court's ruling in *In re Pittsburgh Corning Corp.*, 453 B.R. 570 (Bankr. W.D. Pa. 2011). It found that the Montana Claims are "derivative," *i.e.*, they seek to hold CNA directly or indirectly liable for Grace's conduct, because the underlying injuries are based on exposure to Grace's asbestos products or operations.

The Court then decided the Montana Claims can only exist "by reason of" CNA's provision of insurance to Grace because any alleged duty CNA has to conduct industrial hygiene services arises from the parties' insurance policies. The Court also ruled the Injunction does not exceed the Bankruptcy Court's jurisdiction because the Trust has a contractual obligation to reimburse CNA for liability from personal injury claims (including the Montana Claims) affecting the assets of the bankruptcy estate. Finally, it rejected the Montana Plaintiffs' assertion that CNA's providing insurance is not legally relevant to the Montana Claims, finding instead that they stem from CNA's insurance to Grace.

Second, the Court addressed Plaintiffs' contention that (1) the Montana Claims trace to CNA's Workers' Compensation & Employers' Liability Policies covering Grace, and (2) thus the Injunction does not enjoin those actions. It found the exception to the Injunction is for

12

workers' compensation *claims*, not *policies*, and none of the Montana Claims are for workers' compensation. It also concluded that, due to the Injunction's workers' compensation carve-out, there is no risk of federal bankruptcy law preempting a state workers' compensation scheme in this context.

## II.     Jurisdiction and Standard of Review

We granted a direct appeal under 28 U.S.C. § 158(d)(2). We review *de novo* the Court's grant of summary judgment, *In re AE Liquidation, Inc.*, 866 F.3d 515, 522 (3d Cir. 2017), and we affirm only if, viewing the facts in the light most favorable to the Montana Plaintiffs, we conclude "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). Summary judgment is only appropriate if no reasonable jury could find the Montana Claims were not included under the terms of the Injunction or could not be included in it under § 524(g)(4).

## III.     Discussion

We review the issues on appeal in the order they were briefed (which differs from their order in the Bankruptcy Court's decision).

### A.     Applying the Injunction to the Montana Claims

We turn first to the Montana Plaintiffs' argument that the Injunction does not, by its terms, bar the Montana Claims. We have reviewed the Grace Plan, the Settlement Agreement, and the CNA Workers' Compensation & Employers' Liability Policies. We conclude that the CNA Policies are among those covered by the Injunction's terms, though buried

13

in a befuddling maze of defined terms, and that the Montana Claims do not fall under the Injunction's workers' compensation exclusion.

Claims barred by the Injunction include tort claims made against certain protected third parties directly or indirectly resulting from personal injury and exposure to Grace's asbestos. Third parties protected from these claims include CNA and other insurance companies who entered into settlement agreements with Grace. They are protected, however, only to the extent their policies are identified as subject to a settlement agreement.

Twenty-five CNA policies are identified in the Settlement Agreement, along with a catch-all for "all known and unknown policies, or portions of policies," issued by CNA to Grace through June 30, 1985 that actually or potentially provide insurance coverage for asbestos-related claims of bodily injury. These asbestos-related claims include any made against Grace or CNA "arising in whole or in part (directly or indirectly) by reason of" CNA's provision of insurance to Grace, if these claims involve bodily injury caused by Grace's asbestos. The Settlement Agreement specifically covers any claims alleging CNA has a duty to provide industrial hygiene, conduct inspections, provide warnings or educational services, or protect third parties from the danger of asbestos exposure. As noted, excluded from protection are any rights or obligations that pertain solely to CNA's coverage for state workers' compensation benefits.

The Montana Plaintiffs argue the CNA Workers' Compensation & Employers' Liability Policies are not included among the 25 listed policies and thus are not covered by the Injunction. Our review, however, shows that CNA entered into a settlement agreement with Grace, that the catch-all for all "known and unknown policies" includes the

14

CNA Policies, and that the CNA Policies provide coverage for bodily injuries caused by Grace asbestos. Hence they are covered by the Injunction though they are not specifically listed.

Plaintiffs further contend that claims against CNA may not be enjoined because it is a workers' compensation insurer. This argument misreads the workers' compensation carve-out: it excludes from the Injunction *rights or obligations* that *pertain solely* to workers' compensation benefits.[2] CNA provided not only workers' compensation coverage but also employers' liability coverage; provisions of the CNA Policies that pertain to both workers' compensation and employers' liability coverage do not "pertain solely" to workers' compensation and thus are not excluded. The provisions relevant to the Montana Claims—those that give CNA the right, but not the obligation, to inspect the Libby Facility's industrial hygiene—apply to both types of coverage. They appear outside the sections on employers' liability and workers' compensation, and, unlike other provisions in the CNA Policies, they contain no indication that they apply to one type of coverage to the exclusion of the other. Accordingly, claims tied to these provisions are barred by the Injunction's terms.

The Montana Plaintiffs ask us to interpret the Plan and Settlement Agreement's terms to preserve all of CNA's duties as a workers' compensation insurer and all rights of workers' compensation claimants (which, they allege, state law requires). To do otherwise, they claim, would impermissibly preempt state law. We agree with the Bankruptcy Court and see no conflict between our interpretation of these

_____

[2] We depart from the Bankruptcy Court's finding that the exception is for workers' compensation claims; it is for rights or obligations that pertain solely to those claims.

15

documents' terms and the state workers' compensation obligations to which Plaintiffs refer.[3] Provisions of the CNA Policies that solely cover claims to state workers' compensation benefits are excluded from the terms of the Injunction, and, moreover, the Montana Plaintiffs do not allege any violation of state workers' compensation laws. In this context, we see no risk that the Grace Plan or the Settlement Agreement would preempt Montana workers' compensation law.

### B. The Permissible Scope of the Injunction under Section 524(g)(4)

To repeat, § 524(g)(4)(A)(ii) allows third-party-claims channeling injunctions to "bar any action directed against a third party who is identifiable . . . and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability . . . arises by reason of" one of four statutory relationships between the third party and the debtor. § 524(g)(4)(A)(ii). The parties do not dispute that CNA is identified as protected by the Injunction; this satisfies the first condition for coverage by a third-party-claims channeling injunction. We assess only the second and third conditions for protection: whether the Montana Claims seek to hold CNA "directly or indirectly liable for the conduct of, claims against, or demands on" Grace, *i.e.*, the "derivative liability" requirement, and whether CNA's alleged liability "arises by reason of" its provision of insurance to Grace, *i.e.*, the "statutory relationship"

---

[3] They cite obligations under Montana law that include reporting, investigation, and notification requirements for workers' compensation claims. *See, e.g.*, Mont. Code Ann. §§ 39–71–101, *et seq.*

16

requirement. *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 234–35 (distinguishing the "derivative liability" requirement from the "statutory relationship" requirement).

### i. The "Derivative Liability" Requirement

The Montana Plaintiffs contend that the Montana Claims do not seek to hold CNA "directly or indirectly liable for the conduct of, claims against, or demands on" Grace and, as a result, may not be enjoined under § 524(g)(4). They argue that unlike direct or indirect actions against CNA to recover from its insurance policies for Grace's liabilities, the Montana Claims, which are based on CNA's *own misconduct*, are beyond the Injunction's scope. CNA disagrees. It repeats the Bankruptcy Court's conclusion that suits against it for allegedly failing to prevent injuries caused by Grace's asbestos operations are *per se* attempts to hold it indirectly liable for the conduct of and claims against Grace.

In *Combustion Engineering* we interpreted the relevant statutory language to permit channeling injunctions to enjoin "actions against third parties . . . where a third party has derivative liability for the claims against the debtor." 391 F.3d at 234. By contrast, "the plain language of the statute makes clear[] [it] does not permit the extension of a channeling injunction to include . . . non-derivative third-party actions," *i.e.*, "claims against [third parties that] allege independent liability[] wholly separate from any liability involving [the debtor]." *Id.* at 235. With this understanding, we are not convinced by either the Montana Plaintiffs' or CNA's interpretation of § 524(g)(4) because the former is overly narrow and the latter overly broad.

We first set aside the Montana Plaintiffs' attempt to constrain the meaning of "direct[] or indirect[] liab[ility] for

17

the conduct of, claims against, or demands on" a debtor to actions for insurance proceeds. In an insurance context, a direct action against an insurer—whereby a beneficiary may sue the insurer directly rather than sue the insured—is no doubt an attempt to hold the insurer "directly liable" for claims against its insured. But the statute's text in no way indicates that this is the sole form of an insurer's "direct[] liab[ility]" for the conduct of, claims against, or demands on a debtor. § 524(g)(4)(A)(ii). And nothing in the statute's text supports indirect insurer liability only where a claimant seeks to recover from insurance proceeds.

Additionally, that a third party is alleged to have engaged in some wrongdoing is not enough to render a claim against it independent if its liability depends on the debtor's liability.[4] Theories of liability exist that involve a third-party's wrongdoing but are no less derivative of a principal's

---

[4] The Montana Plaintiffs cite to the Second Circuit's decision in *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), *rev'd sub nom. Travelers Indemn. Co. v. Bailey*, 557 U.S. 137 (2009), to support their position. Beyond the fact that the decision was reversed by the Supreme Court, it involved a channeling injunction entered into prior to the enactment of § 524(g)(4), and, further, in that case "it [was] undisputed that many of the plaintiffs [sought] to recover from [the insurer], not indirectly for [the debtor's] wrongdoing, but for [the insurer's] own alleged violations of state law." *Bailey*, 557 U.S. at 143. This stands in contrast to the dispute before us, which centers on whether, following § 524(g)(4), the Montana Claims seek to recover from CNA directly or indirectly for Grace's wrongdoing.

18

wrongdoing or liability.[5] *See N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014); *Quigley*, 676 F.3d at 60; *cf. In re Tronox Inc.*, 855 F.3d 84, 88–89 (2d Cir. 2017); *see also Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (explaining indirect *respondeat superior* liability and direct liability through failure to supervise); *Gass v. V.I. Tele. Corp.*, 311 F.3d 237, 241 (3d Cir. 2002) (citing Restatement (Second) of Torts §§ 410, 414 (1965)).

Likewise, CNA's proposed interpretation is equally unpersuasive: that a debtor's product caused a plaintiff's injury is not enough to render a third party liable "for the conduct of, claims against, or demands on the debtor." After our decision in *Combustion Engineering*, the Bankruptcy Court agreed with CNA's position and found claims against protected third parties based on the claimant's injury from or exposure to the debtor's asbestos products were "derivative."[6]

---

[5] We do not overlook a third-party's "direct[] or indirect[] liab[ility]" based on claims for which it is not alleged to have engaged in any independent wrongdoing. In the context of insurance, examples include indemnification or contribution claims brought by a non-settling insurer against a settling insurer for payments made due to the debtor's liability. *See Plant Insulation*, 734 F.3d at 911; *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 980, 982 (1st Cir. 1995). Another example, outside the insurance context, is successor liability. *Quigley*, 676 F.3d at 60.

[6] CNA contends our decision in *W.R. Grace*, 729 F.3d 311, agrees with its position. It misconstrues the legal issue and our reasoning in that case. The State of Montana and the Canadian Crown sought indemnification from Grace for

*See In re Pittsburgh Corning*, 417 B.R. 289, 293 (Bankr. W.D. Pa. 2006) ("[T]o the extent [the third parties] are alleged to be jointly and severally liable for [the debtor's] products . . . or conduct, . . . we find that the claims against the [third parties] are derivative and can be channeled under § 524(g)."). Such a rule, however, has the potential to include third-party liability that is wholly separate from a debtor's liability.

The involvement of the debtor's asbestos is relevant, but not dispositive. For instance, where the third-party's liability is based on exposure to a *non-debtor*'s asbestos, it is clearly not derivative of the conduct of or a claim against the *debtor. See Combustion Eng'g*, 391 F.3d at 231. But there may be cases in which the involvement of the debtor's product is only incidental (for example, if a piece of building material containing Grace asbestos in a CNA office fell and

---

failure-to-warn suits brought against them. Their effort came into conflict with § 524(g)(1)(B), which allows an injunction to bar legal actions for the purpose of "directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust . . . ." *Id.* The issue was not whether Montana and the Crown's *liability* was "indirect;" rather, it was whether indemnification by Grace would constitute "indirectly collecting . . . with respect to any claim . . . that . . . is to be paid . . . by [the] [T]rust . . . ." § 524(g)(1)(B). The claim for indemnification depended on whether Grace was liable for the underlying personal injury suits, and claims of that sort in indemnification suits were properly channeled to the Trust. 729 F.3d at 324.

20

struck someone). There too the presence of the debtor's asbestos would not render the third-party's liability derivative.

The proper inquiry is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it.[7] This does not require the reviewing court to decide state-law claims on the merits. It does, however, require it to ascertain what liability under the relevant law demands. We do not undertake this analysis here because we have not been fully briefed on which state's law applies under a choice-of-law analysis or on what that state's law requires for CNA to be liable as alleged in the Montana Claims. Instead, we vacate this portion of the Bankruptcy Court's decision and remand for it to make this determination.

Though we rely on the plain language of the statute, we note this mode of analysis is also supported by the structure and purpose of the Bankruptcy Code as it pertains to asbestos liability in bankruptcy. The incentive for third parties, particularly insurers, to contribute to an asbestos personal injury trust is their diminished exposure to asbestos liability from the asbestos debtor's conduct or claims against it. Protecting these third parties from derivative exposure

---

[7] Our framework comports with that developed by the Second Circuit in *Quigley*, wherein it looked to the relevant state law to determine whether the plaintiff's rights derived from the debtor's rights and the alleged duty the third party owed to the plaintiffs derived from the duty it owed to the debtor. 676 F.3d at 54–58.

resolves lingering uncertainty about their liability and sustains the trust's ability to compensate current and future claimants.

### ii. The "Statutory Relationship" Requirement

Plaintiffs and CNA contest whether a third-party's "alleged liability . . . arises by reason of" its statutory relationship to the debtor, § 524(g)(4)(A)(ii), when the third-party's liability is a factual consequence (what we know as "but-for causation") or a "legal consequence" of the relationship (*i.e.*, "the relationship, in light of the debtor's conduct or the claims asserted against it, [is] a legal cause of or a legally relevant factor to the third party's alleged liability."). *Quigley*, 676 F.3d at 60. The Bankruptcy Court did not adopt either interpretation. Rather, it decided that, even assuming the "legal consequence" standard applied, "[t]he basis for the alleged undertakings by CNA (*i.e.*, industrial hygiene services or inspections of Grace's facilities) arise wholly out of the insurance relationship," and accordingly the insurance relationship is "legally relevant" to the Montana Claims. *W.R. Grace*, 2016 WL 6068092, at *13. It cited to § 324A of the Restatement (Second) of Torts, from which it stated the Montana Claims stem. *Id.* at *12.

We do not disturb the Bankruptcy Court's assumption that CNA's provision of insurance to Grace must be a "legally relevant factor" to its alleged liability.[8] But even

---

[8] Though CNA calls the required connection "but-for" causation, it actually describes a "legal consequence" connection: it states its alleged duty (certainly a legally relevant factor in negligence claims) derives directly from its provision of insurance to Grace, which includes routine inspection practices by CNA. Hence we see no conflict

under this assumption, the Court should review the applicable law to determine the relationship's legal relevance to the third-party's alleged liability.[9] Similar to the "derivative liability" analysis above, the Court should examine the elements necessary to make the Montana Claims under the applicable law (here, state law), and determine whether CNA's provision of insurance to Grace is relevant legally to those elements. At this juncture, the record is not sufficiently developed for us to undertake that analysis, prompting us also to remand for the Bankruptcy Court to do so.

## C.    Jurisdiction

Next, the Montana Plaintiffs argue the Settlement Agreement provision allowing for $13 million in reimbursements to CNA for any payments made for asbestos personal injury claims does not confer jurisdiction on the Bankruptcy Court to enjoin the Montana Claims. Whether the Court had jurisdiction was not an issue before it. Rather, the Court discussed its jurisdiction in the context of addressing the Montana Plaintiffs' argument that third-party-claims channeling injunctions under § 524(g)(4) are limited to claims against insurance proceeds. The Court rejected this argument and stated correctly that the relevant jurisdictional inquiry is whether the claims affect the assets of the bankruptcy estate.

---

between the parties' suggested interpretations of the statute's requirement.

[9] We reach no conclusion on whether § 324A of the Restatement (Second) of Torts applies to the Montana Claims because, as already stated, we have not been fully briefed on what state's law applies under a choice-of-law analysis. Nor have we been briefed on whether that State applies the Restatement provision as its own law.

23

In this case the indemnification provision in Grace and CNA's Settlement Agreement does so.

We agree with CNA's argument that the Montana Plaintiffs misread our precedent in *Combustion Engineering* and jurisdiction was not an issue before the Court. Thus we address the issue only briefly. In that case, we reiterated our oft-repeated *Pacor* standard for "related to" jurisdiction in bankruptcy: a proceeding is "related to" a Chapter 11 proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 391 F.3d at 226 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), *overruled in part by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)) (emphasis omitted); *see also Nuveen Mun. Trust v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293–95 (3d Cir. 2012). "'[R]elated to' jurisdiction [exists] over actions [against] non-debtors involv[ing] contractual indemnity obligations between the debtor and non-debtor that automatically result in indemnification liability against the debtor." *Combustion Eng'g*, 391 F.3d at 226. Such is the case here, as the Trust is obligated by contract to indemnify CNA up to $13 million for its asbestos personal injury liability within the meaning of § 524(g)(4). Hence we do not doubt the Bankruptcy Court's jurisdiction to enforce the Injunction.

## IV.    Conclusion

We affirm the Bankruptcy Court's decision that the Montana Claims are included in the terms of the Injunction. We vacate its decision that the Montana Claims may be enjoined under § 524(g)(4) and (as we see no defect in its jurisdiction to enforce the Injunction) remand to it with guidelines. First, to determine whether a claim seeks to hold a third party derivatively liable for the debtor, the Court must decide whether the third-party's alleged liability is "wholly

24

separate" from the debtor's liability under the applicable law or instead depends on it. Second, even assuming the statutory relationship must be a "legally relevant factor" to the third-party's alleged liability, the Court should decide whether it is relevant to the elements required for the liability alleged under the applicable law.

Thus we affirm in part and vacate and remand in part to the Bankruptcy Court.