**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1916
_____

IN RE: MTE HOLDINGS LLC, et al.,

Debtors

CHENAULT-VAUGHAN FAMILY PARTNERSHIP,
LTD,

Appellant

v.

MDC REEVES ENERGY, LLC; CENTENNIAL
RESOURCE DEVELOPMENT, INC.; CENTENNIAL
RESOURCE PRODUCTION, LLC
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:21-cv-01846)
Magistrate Judge: Honorable Sherry R. Fallon
_____

Argued on December 10, 2024

Before: BIBAS, FREEMAN, and ROTH, *Circuit Judges*

(Opinion filed: May 7, 2025)

Jana Yocom Rine               [ARGUED]
YOCOM RINE
2150 South Central Expressway
McKinney, Texas 75070

    *Counsel for Appellant*


Robert P. Crumpler, Jr.      [ARGUED]
DAVIS, GERALD & CREMER
400 W. Illinois, Suite 1400
Midland, Texas 79701

William A. Hazeltine
SULLIVAN, HAZELTINE, ALLINSON
919 N Market Street, Suite 420
Wilmington, Delaware 19801

Lisa A. Paulson
DAVIS, GERALD & CREMER
515 Congress Avenue, Suite 1510
Austin, Texas 78701

    *Counsel for Appellees*

David R. Kuney             [ARGUED]
9200 Cambridge Manor Court
Potomac, Maryland 20854

   *Court Appointed Amicus Curiae*

_____

OPINION OF THE COURT
_____

FREEMAN, *Circuit Judge*.

This appeal arises from a dispute between participants in Texas's oil and gas industry. Chenault-Vaughan Family Partnership ("Chenault"), a royalty interest holder in a mineral estate, sued Centennial Resources Operating, LLC ("Centennial"), the operator of the site, for wrongly withholding royalties. The Bankruptcy Court exercised jurisdiction over the adversary proceeding and awarded summary judgment to Centennial. Chenault appealed to the District Court, where the parties consented to proceed before a Magistrate Judge for all proceedings, including final judgment. The Magistrate Judge affirmed the Bankruptcy Court's judgment, and Chenault appealed to us.

Before proceeding to the merits, we must determine whether the Magistrate Judge—who presided with the consent of the parties and a referral by the District Court—had jurisdiction to enter final judgment in this bankruptcy appeal. In the forty years since we last opined on this issue, Congress has repealed the statutory provision that expressly prohibited district courts from referring bankruptcy appeals to magistrate

judges. Congress also has imbued magistrate judges with broad authority in civil cases when the parties consent. For these reasons, we conclude that the Magistrate Judge properly exercised jurisdiction here.

On the merits, Chenault appeals the Magistrate Judge's order affirming the Bankruptcy Court's summary judgment as to two claims. We will affirm the Magistrate Judge's order in part and vacate it in part. We will affirm the order insofar as it affirms the summary judgment for Centennial on Chenault's trespass-to-try-title claim. However, we will reverse the order insofar as it affirms the summary judgment for Centennial on Chenault's Texas Natural Resource Code ("TNRC") claim. We will remand to the Magistrate Judge with instructions to remand to the Bankruptcy Court for further proceedings on the TNRC claim.

## I.

Chenault owns a one-sixth mineral interest in a certain tract of Texas land. Chenault conveyed a working interest to a company called 84 Exploration Partners ("84 Exploration") through an oil and gas lease (the "Lease"). As relevant here, that working interest provided 84 Exploration the right to exploit certain minerals (oil and gas) in the land. In exchange, 84 Exploration promised to pay Chenault a royalty: one-fourth of the minerals or the value of the minerals that 84 Exploration produced. Thus began a series of transactions in which 84 Exploration assigned its rights to other companies, who in turn assigned them to others. When the dust settled, MDC Reeves Energy, LLC ("MDC") owned about 80% of the working

4

interest, while a company called Luxe owned 20%.[1] (MDC is a debtor in the jointly administered bankruptcy cases to which this adversary proceeding relates.) Because Chenault retained its royalty interest, MDC and Luxe each owed Chenault a one-fourth royalty for their respective shares. In 2017 and 2019, Centennial created two pooled units that contained MDC's and Luxe's working interests, Iron Eagle Unit A and Unit B.[2] The relevant transactions are summarized in the below schematic:



---

[1] Luxe is not involved in this appeal.

[2] A pooled unit is created when "tracts from two or more leases are combined for the purpose of drilling a single well" and "production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." 1 Texas Law of Oil and Gas 4.8.

Centennial signed a joint operating agreement for Unit A ("Unit A JOA") with MDC and Luxe, under which Centennial became the operator of the Luxe and MDC shares of the Lease. The Unit A JOA provided that Centennial would pay expenses for development, including the royalties that MDC and Luxe owed to Chenault, and would charge each party its proportionate share of those expenses. Centennial and Luxe signed a similar joint operating agreement for Unit B (the "Unit B JOA"), and they anticipated that MDC would sign it as well, but MDC never did.[3]

Nonetheless, Centennial paid royalties to Chenault for both MDC's and Luxe's Unit B shares from March 2019 until February 2020. The Bankruptcy Court found that Centennial paid $137,276.73 in royalties on MDC's behalf based on the mistaken assumption that MDC had become party to the Unit B JOA.

On November 8, 2019, MDC filed for Chapter 11 bankruptcy. On November 19, 2019, Centennial rescinded a well proposal for Unit B on the basis that MDC had not signed the Unit B JOA, but it continued to pay MDC's share of Unit B royalties to Chenault until February 2020.

Centennial asserts that "[a]round February 2020" it learned that MDC was not a party to the Unit B JOA. App. 360. It then took steps to recoup what it concluded were wrongful Unit B overpayments to Chenault by setting off Unit A royalty payments. By the end of February 2021, Centennial fully recouped the $137,276.73 in Unit B royalties that

---

[3] Luxe signed the Unit B JOA on June 4, 2019. Centennial signed on August 12, 2019.

Centennial maintains it had mistakenly overpaid Chenault. In March 2021, Centennial resumed sending Unit A royalties to Chenault.

In November 2020, Chenault filed a complaint (the "Adversary Proceeding") in the United States Bankruptcy Court for the District of Delaware against MDC, Centennial, and Centennial's parent company. It brought several claims arising from Centennial's alleged underpayment or failure to pay Unit B royalties.

In January 2021, the Bankruptcy Court presiding over the Chapter 11 proceeding permitted debtor MDC to abandon the Unit B Lease.

In the Adversary Proceeding, Chenault and Centennial both moved for summary judgment. In December 2021, the Bankruptcy Court granted partial summary judgment in favor of Centennial. It held that, based on Centennial's mistaken belief that MDC signed the Unit B JOA, Centennial was entitled to deduct $137,276.73 in pre-abandonment Unit B royalties from pre-abandonment royalties owed on Unit A. The Bankruptcy Court granted full summary judgment to Centennial one month later.[4]

_____

[4] In January 2022, the Bankruptcy Court held in the Adversary Proceeding that Chenault is not owed any royalties for the period after MDC abandoned the Lease. Although cotenants are owed their share of the value of production, Centennial and Chenault agreed that no Unit B wells reached payout (when the value of the production exceeds costs). Thus, no royalties

7

Chenault timely appealed the Bankruptcy Court's summary-judgment decision to the District Court. The parties consented to proceed before Magistrate Judge Sherry R. Fallon for all proceedings, including the entry of final judgment. The District Court then referred the case to Magistrate Judge Fallon pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

The Magistrate Judge *sua sponte* raised the question of her own jurisdiction, noting the uncertainty about whether magistrate judges have authority to issue final judgments in bankruptcy appeals. As a hedge against this uncertainty, the Magistrate Judge crafted her opinion so that "in the event that the Third Circuit determines that a Magistrate Judge lacks authority to issue a final judgment on a bankruptcy appeal, even where the parties consented, then this Memorandum Opinion contains sufficient detail so that it can be treated, alternatively, as a Report and Recommendation pursuant to 28 U.S.C. § 636(b)." App. 14–15. On the merits, the Magistrate Judge agreed with the Bankruptcy Court in essentially all respects, and she entered a final order affirming the Bankruptcy Court's judgment. Chenault timely appealed to us.

**II.**

Our jurisdiction to hear this appeal turns on whether the Magistrate Judge had jurisdiction to enter a final judgment in

accrued after MDC abandoned the Lease. The Bankruptcy Court also entered judgment in favor of MDC based on Chenault's representation that it did not seek to recover against MDC's bankruptcy estate.

8

the bankruptcy appeal.[5] *See Prater v. Dep't of Corr.*, 76 F.4th 184, 190 (3d Cir. 2023) ("When a magistrate judge lacks jurisdiction, so do we."). "We review de novo whether a magistrate judge had jurisdiction to issue a final order. And we review our own jurisdiction de novo." *Id.* at 193 (citations omitted).

The Magistrate Judge entered final judgment pursuant to 28 U.S.C. § 636(c), which provides, in relevant part:

> Notwithstanding any provision of law to the contrary[,] . . . [u]pon the consent of the parties, a full-time United States magistrate judge or a part-time United States magistrate judge who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves.

28 U.S.C. § 636(c)(1). Over forty years ago, we held that a magistrate judge lacked jurisdiction under section 636(c)(1) to issue a final order in a bankruptcy appeal, notwithstanding the consent of the parties. *In re Morrissey*, 717 F.2d 100, 101 (3d Cir. 1983). In that decision, we addressed the Bankruptcy Reform Act of 1978 (the "BRA")—the predecessor to the current bankruptcy statutory scheme. The BRA "contain[ed]

---

[5] We appointed David R. Kuney, Esq. as *Amicus Curiae* to argue the position that a magistrate judge lacks jurisdiction to issue a final judgment in a bankruptcy appeal. We thank Amicus for his service to the Court.

9

specific provisions for appeals from bankruptcy courts to the district courts." *Id.* at 102. As relevant here, it provided that "[a] district court *may not* refer an appeal under that section to a magistrate or to a special master." *Id.* at 103 (emphasis added) (quoting 28 U.S.C. § 1334(c) as it then existed). Based on this provision (hereafter, "the Express Prohibition"), we "read the unambiguous congressional command contained in § 1334(c) to mean exactly what it says," and we held that Congress had "prohibited a district court from referring a bankruptcy appeal to a magistrate." *Id.*

The year after Congress enacted the BRA, it enacted the Federal Magistrate Act of 1979 (the "FMA"), Pub. L. No. 96-82, 93 Stat. 643. The FMA enacted extensive additions to the original Federal Magistrates Act of 1968, Pub. L. No. 90-578, 82 Stat. 1107. *See Minerex Erdoel, Inc. v. Sina, Inc.*, 838 F.2d 781, 784 (5th Cir. 1988). One such addition was the FMA's broad consent provision, section 636(c)(1), which expanded the authority of magistrate judges, "[n]otwithstanding any provision of law to the contrary," to encompass "any or all proceedings in a jury or nonjury civil matter." *Id.* at 782 n.1, 784 (quoting 28 U.S.C. § 636(c)).

While the consent authority of magistrate judges has remained intact since 1979, the BRA has not. In 1982, the Supreme Court declared parts of the BRA unconstitutional. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669–70 (2015) (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion)). As a result, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). *See id* at 670.

10

The BAFJA "prescribed the treatment of appeals from the rulings of bankruptcy judges." *Minerex*, 838 F.2d at 785. It did so by "gathering together the several scattered provisions of the BRA . . . and assembling them into a single comprehensive scheme for such appeals," which the BAFJA codified at 28 U.S.C. § 158. *Id.* The BAFJA "completely rewrote" 28 U.S.C. § 1334. *Id.* The Express Prohibition on the referral of bankruptcy appeals to magistrate judges "was repealed by simple omission." *Id.*

Congress repealed the Express Prohibition after our decision in *Morrissey*. Thus, this appeal presents a question of first impression in this Circuit under the current statutory regime. We hold that, upon consent of the parties and referral by a district court, a magistrate judge may enter final judgment in a bankruptcy appeal.

Several considerations support this conclusion. At the outset, our conclusion follows from the breadth of a magistrate judge's authority under the FMA with party consent. In *Prater v. Department of Corrections*, 76 F.4th 184 (3d Cir. 2023), we addressed the consolidated appeals of three cases in which magistrate judges sought to enter final orders. We determined that "the magistrate judges' jurisdiction to enter final orders in each . . . case[] turn[ed] on the parties' consent." *Id*. at 190. We explained that, absent party consent, a magistrate judge lacks jurisdiction under the FMA to enter a final order. *Id.* at 194. By contrast, when all parties consent, section 636(c)(1) grants a magistrate judge "jurisdiction [that] is coextensive with the district court's jurisdiction, extending to any or all proceedings, including entry of final judgment." *Id*. at 194–95. In that scenario, the magistrate judge's final judgment is directly appealable to this Court "in the same manner as an

11

appeal from any other judgment of a district court." *Id.* at 197 (quoting 28 U.S.C. § 636(c)(3)).

Statutory changes post-*Morrissey* also support our conclusion. In *Morrissey*, we held that the BMA's Express Prohibition trumped the broad consent authority granted to magistrate judges under FMA section 636(c). We reasoned that the Express Prohibition "was enacted subsequent to the Magistrate's Act [of 1968] and we read it as an attempt by Congress to specifically limit its originally pervasive applicability." *Morrissey*, 717 F.2d at 103 n.4. (In *Morrissey*, we were mistaken about the order of the relevant enactments. Although the Magistrate's Act was enacted in 1968, it was amended to provide for the consent authority of magistrate judges in 1979—the year after Congress enacted the BRA and its Express Prohibition.) But Congress subsequently repealed the Express Prohibition when it enacted the BAFJA in 1984. Since that repeal, there has been no barrier to magistrate judges' authority to enter final judgments in bankruptcy appeals pursuant to section 636(c) with the consent of the parties. As we held in *Prater*, "when there is party consent, the magistrate judge's jurisdiction is coextensive with the district court's jurisdiction." *Prater*, 76 F.4th at 194–95.

Two other circuits have held otherwise, and a third has suggested otherwise in dicta. Despite Congress's repeal of the Express Prohibition, those courts reason that "if Congress had wanted district courts to have the power to refer appeals to magistrates, Congress would have specifically so provided." *In re Elcona Homes Corp.*, 810 F.2d 136, 139 (7th Cir. 1987); *see also Minerex*, 838 F.2d at 786 ("[H]ad Congress meant for its [bankruptcy] appeals scheme to include the potential for reference to a magistrate, Congress would have expressly so

12

provided."); *Virginia Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849, 851 (10th Cir. 1990) (stating, without discussion, that "magistrates are not permitted to enter final decisions in bankruptcy appeals"—while noting that this issue was not present in the case). We cannot agree. Our discussion in *Prater*, the later-in-time logic of *Morrissey*, the repeal of the Express Prohibition, and section 636(c)'s grant of consent authority to magistrate judges "[n]otwithstanding any provision of law to the contrary" all support our conclusion.

Our decision today also accords with the reality that magistrate judges function as part of a district court. We addressed the role of magistrate judges in *Wharton-Thomas v. United States*, 721 F.2d 922 (3d Cir. 1983). There, we held that entry of final judgment by a magistrate judge upon consent of the parties, as a general matter, does not violate Article III of the United States Constitution. *Id.* at 929–30. Unlike the constitutional concerns that caused the Supreme Court to strike down part of the BRA, *see id.* at 927 (observing that the Supreme Court struck down portions of the BRA on the basis that bankruptcy courts "operate[], not under the direction of the district court, but in their own separate sphere and with their own independently appointed personnel"), we explained that a "magistrate [judge] is truly a part of the district court, appointed by its judges, 28 U.S.C. § 631(a), and subject to dismissal by them, *id*. § 631(i)," *id.* For instance, we noted:

> A magistrate [judge] may not conduct any proceeding in a civil matter unless "specifically designated to exercise such jurisdiction by the district court or courts he serves." [28 U.S.C.] § 636(c)(1). Even consensual reference of a case to a magistrate [judge] may be vacated by a

13

> district judge, either *sua sponte* or in some circumstances on motion of the parties. *Id.* § 636(c)(6). As with matters handled by district judges, the clerk of the district court manages the records in cases referred to the magistrate [judge]. Thus, the magistrate [judge] does not function independently of the district court, but as an integral part of it.

*Id.*[6] Because magistrate judges are an integral part of the district court, consensual referral of bankruptcy appeals to magistrate judges is consistent with district courts' authority under section 158(a) to hear bankruptcy appeals.

Lastly, today's decision comports with separation-of-powers principles. The right to an Article III adjudicator is a personal right that is subject to waiver. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986). But Article III also "serves as an inseparable element of the constitutional system of checks and balances." *Id.* at 850 (cleaned up). It "safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby preventing the encroachment or aggrandizement of one branch at the expense of the other." *Id.* (cleaned up). And "allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as

---

[6] When we decided *Wharton-Thomas*, 28 U.S.C. § 636(c)(6) permitted a district judge to vacate a consensual referral to a magistrate judge. That provision is now codified at 28 U.S.C. § 636(c)(4).

Article III courts retain supervisory authority over the process." *Wellness Int'l*, 575 U.S. at 678.

When magistrate judges decide bankruptcy appeals, their "jurisdiction . . . is not based solely on the consent of the parties, but derives from a proper designation by the district court." *Morrissey*, 717 F.2d at 102; 28 U.S.C. § 636(c)(1). And the Article III judges of the district court retain supervisory authority, including the ability to rescind a designation to a magistrate judge. 28 U.S.C. § 636(c)(4); Fed. R. Civ. P. 73(b)(3). Moreover, when a magistrate judge enters a final order in a bankruptcy appeal, the non-prevailing party can appeal as of right to a Court of Appeals and obtain review there by Article III adjudicators. 28 U.S.C. § 158(c)(2). In these ways, separation of powers is respected.[7]

Because a magistrate judge may enter final judgment in a bankruptcy appeal with consent of the parties and a referral by the district court, the Magistrate Judge here was authorized to enter a final judgment in Chenault's appeal.

## III.

Chenault's appeal concerns the Bankruptcy Court's summary judgment on two claims: its trespass to try title claim (Count I) and its claim for royalties under Texas Natural Resources Code § 91 (Count II). The Bankruptcy Court exercised jurisdiction over the Adversary Proceeding under 28

---

[7] The capacity of district court judges is also respected when those Article III judges obtain assistance from their able magistrate-judge colleagues. *See Wellness Int'l*, 575 U.S. at 680–81.

U.S.C. § 157(c)(1).[8] As discussed above, the Magistrate Judge sat as the District Court and had jurisdiction to hear the bankruptcy appeal under 28 U.S.C. § 158(a)(1). We have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291.

"We stand in the shoes of the District Court and exercise plenary review of the Bankruptcy Court's decision granting summary judgment . . . ." *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 503 (3d Cir. 2021). Summary judgment is

---

[8] On de novo review, *In re Resorts Int'l, Inc.*, 372 F.3d 154, 160 (3d Cir. 2004), we reject Chenault's frivolous challenge to the Bankruptcy Court's jurisdiction.

28 U.S.C. § 157(c)(1) authorizes a bankruptcy judge to "hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." A proceeding is "related to" a case under title 11 when the outcome of the proceeding "could conceivably have an[] effect on the estate being administered in bankruptcy." *In re W.R. Grace & Co.*, 900 F.3d 126, 139 (3d Cir. 2018) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004)). Courts make this jurisdictional determination at the time of a case's filing. *In re SemCrude L.P.*, 864 F.3d 280, 289 (3d Cir. 2017).

Chenault filed the Adversary Proceeding in the Bankruptcy Court that was presiding over MDC's then-pending Chapter 11 case, and it named MDC as a defendant. It also invoked the Bankruptcy Court's related-to jurisdiction, and alleged that Centennial or, alternatively, MDC is obligated to royalties to Chenault. Thus, it was plain at the time of filing that Chenault's lawsuit could conceivably have affected MDC's bankruptcy estate.

appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[9] *Id.*; Fed. R. Civ. P. 56(a). We view all facts in the light most favorable to the non-moving party, and we draw all reasonable inferences from the record in that party's favor. *Weinstein Co.*, 997 F.3d at 503.

## A.

"A trespass to try title action is the method of determining title to lands, tenements, or other real property." Tex. Prop. Code § 22.001(a). To prevail on such a claim, a plaintiff must prove (among other elements) that "the defendant . . . unlawfully entered upon and dispossessed [plaintiff] of such premises, stating the date, and withholds from him the possession thereof." Tex. R. Civ. P. 783. Here, Centennial did not unlawfully enter the land and dispossess Chenault. Even after MDC abandoned the Lease, Luxe was still Chenault's cotenant with a right to extract the minerals. Luxe was also entitled to permit Centennial, its operator, to enter the land and drill on it. Because the costs of development

---

[9] The parties agree that Texas law controls in this case. We accede to their choice of law. *See In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 n.10 (3d Cir. 1995) ("Where, as here, the parties do not make an issue of choice of law, we have no obligation to make an independent determination of what rule would apply if they had made an issue of the matter." (cleaned up)); *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (applying the law the parties relied on in their briefs where the contract at issue did not specify what law governs and the parties did not brief or argue a choice-of-law issue).

17

and production were not yet recovered, Centennial did not trespass on Chenault's mineral interests by withholding payment post-abandonment. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 426 (Tex. 2008) ("It has long been the rule in Texas that a cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants; however, he must account to them on the basis of the value of any minerals taken, less the necessary and reasonable costs of production and marketing." (quoting *Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex. 1986))). Thus, Chenault's trespass to try title claim fails.

B.

The TNRC provides that, after the first sale of production from an oil and gas well, payments must be made from a "payor" to a "payee" on "a timely basis according to the frequency of payment specified in a lease or other written agreement between payee and payor." Tex. Nat. Res. Code § 91.402(a). The statute defines "payor" as "the party who undertakes to distribute oil and gas proceeds to the payee, whether as the purchaser of the production of oil or gas generating such proceeds or as operator of the well from which such production was obtained or as lessee under the lease on which royalty is due." *Id.* § 91.401(2). It defines "payee" as "any person or persons legally entitled to payment from the proceeds derived from the sale of oil or gas from an oil or gas well located in this state." *Id.* § 91.401(1). And it provides a payee a cause of action against a payor for failure to make timely payments. *Id.*

In its TNRC claim, Chenault asserts that it had a payor-payee relationship with Centennial that required Centennial to

18

pay Unit B royalties to Chenault. In support of Centennial being its payor, Chenault points to the Unit B JOA, the undisputed fact that Centennial paid Chenault pre-abandonment royalties for Unit B, and a division order for "Iron Eagle Unit B U21H" that Chenault signed in July 2019 and addressed to Centennial ("the Division Order").[10] The Division Order lists Centennial as the "Operator" of the listed property. App. 486. It also appears to designate Centennial as "Payor" to Chenault for royalties on sales of oil, gas and related liquid hydrocarbons since the date those minerals were first produced on the property. And the same property description on the Division Order ("Iron Eagle Unit B U21H") is listed on the accounting statement reflecting the royalties Centennial paid to Chenault. App. 356 (showing that Centennial paid $137,276.73 in royalties from March 2019 to February 2020 for "Iron Eagle Unit B U21H").

Centennial argues that it has not obligated itself to be Chenault's payor for Unit B royalties. It first asserts that it could not be a payor because MDC (not Centennial) was Unit B's lessee. But the TNRC does not require a payor to be a lessee. By its plain terms, the statute considers "the party who undertakes to distribute oil and gas proceeds to the payee" to be the "payor," whether that party is "the lessee," "the purchaser of the production of oil or gas generating such proceeds," or the "operator of the well from which such

_____

[10] A division order is "an agreement signed by the payee directing the distribution of proceeds from the sale of oil, gas, casinghead gas, or other related hydrocarbons. The order directs and authorizes the payor to make payment for the products taken in accordance with the division order." TNRC § 91.401(3).

production was obtained." Tex. Nat. Res. Code § 91.401(2). Moreover, Centennial conceded at oral argument that it was a payor to Chenault under the TNRC for Unit A royalties. And Centennial was not the lessee for Unit A. (MDC was lessee for Unit A and Unit B.) So Centennial could be Chenault's payor for Unit B without also being the lessee.

Next, Centennial argues there is no evidence that it intended to be bound to pay Unit B royalties to Chenault. In support, it points to the absence of MDC's signature on the Unit B JOA. Centennial acknowledges that it would have been obligated to pay Unit B royalties to Chenault if MDC had signed the Unit B JOA. It also asserts that it only paid pre-abandonment Unit B royalties to Chenault based on its mistaken belief that MDC had signed the Unit B JOA.

The Bankruptcy Court determined that "there is no dispute in this record that Centennial was unaware of the fact that MDC had not executed the Unit B joint operating agreement at the time it made the royalty payments to Chenault-Vaughan." App. 82–83.[11] But Centennial's awareness on this topic *is* in dispute. The record contains evidence that Centennial knew MDC did not execute the Unit B JOA and nonetheless paid Unit B royalties to Chenault. First, Centennial started paying royalties to Chenault for MDC's share of Unit B in March 2019, before even Centennial had signed the Unit B JOA. Second, when Centennial signed

---

[11] The Magistrate Judge agreed with this view of the facts. App. 26 (stating that Centennial paid Unit B royalties based on a mistake of fact, and "Centennial promptly corrected those actions once it learned that MDC did not sign the Unit B JOA").

20

the Unit B JOA in August 2019 (over two months after Luxe signed), the signature block for MDC remained blank. Third, Centennial's sworn statement that it first learned around February 2020 that MDC had not signed the Unit B JOA is contradicted by another document in the record.[12] A Centennial employee wrote a November 2019 letter stating that "MDC has not signed a JOA" for Unit B. App. 497. Thus, there is a genuine dispute as to whether Centennial knew MDC had not signed the Unit B JOA when Centennial made royalty payments to Chenault from March 2019 through February 2020.

Moreover, notwithstanding any questions about the Unit B JOA, a reasonable jury could find that the Division Order bound Centennial to pay Unit B royalties to Chenault. Under Texas law, division orders are generally binding until revoked. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 123 (Tex. 1996); *Cabot Corp. v. Brown*, 754 S.W.2d 104, 107–08 (Tex. 1987); *Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 692 (Tex. 1986). And a reasonable jury could find that the Division Order created a payor-payee relationship between Centennial and Chenault.

Material facts regarding the Division Order remain in dispute. The Division Order bears Chenault's signature, but the single-page document ends with a request to "Please sign and return" it. App. 486. However, it contains no signature line (blank or otherwise) for the Payor. So it is unclear whether

---

[12] At oral argument before us, Centennial acknowledged that the sworn statement was inaccurate and said the declarant was mistaken.

the Division Order is a complete document or whether Centennial intended to be bound by it.

These disputes of fact preclude summary judgment for Centennial on Chenault's TNRC claim. Accordingly, we will vacate the Magistrate Judge's order affirming the grant of summary judgment.

\*　　\*　　\*

For the foregoing reasons, we will affirm the Magistrate Judge's order insofar as it affirms the Bankruptcy Court's grant of summary judgment for Centennial on the trespass-to-try-title claim. However, we will vacate the Magistrate Judge's order insofar as it affirms the grant of summary judgment for Centennial on the Texas Natural Resources Code claim, and we will remand to the Magistrate Judge with instructions to remand to the Bankruptcy Court for further proceedings.